Reading Municipal Airport Authority *v.* Schuyl-
kill Valley School District, et al.

Argued December 7, 1971, before President Judge
BOWMAN and Judges CRUMLISH, JR., KRAMER, WILKIN-
SON, JR., MENCER and ROGERS.

*Raymond C. Schlegel,* with him *Scott L. Huyett* and *Balmer, Mogel, Speidel & Roland,* for appellant.

*Arthur Ed. Saylor,* with him *Edelman, Schaeffer, Saylor, Readinger and Poore,* for appellee.

OPINION BY JUDGE ROGERS, January 17, 1972:

The Reading Municipal Airport Authority, a municipal authority created by the City of Reading to manage the City's airport, borrowed from a bank money with which it purchased two steel buildings containing a total of 16 T-hangars.[1] It leased the buildings to Reading Aviation Service, a business corporation of the State of Delaware. Reading Aviation Service in turn leases the 16 T-hangars to owners of aircraft based at the airport.

The issue is whether the two buildings are entitled to exemption from local taxation. The Board of Assessment and Revision of Taxes and the Common Pleas Court of Berks County held that they were not. We agree.

Article 8, Section 2 of the Constitution of Pennsylvania provides pertinently that "the General Assembly may by law exempt from taxation . . . (iii) that portion of public property which is actively and regularly used for public purposes." Section 204 of The General County Assessment Law, Act of May 22, 1933, P. L. 853, 72 P.S. §5020-204, exempts from local taxation "[a]ll . . . public property used for public purposes, with the ground thereto annexed and necessary for the occupan-

---

[1] T-hangars are spaces within a building shaped like the letter "T" into which aircraft can be backed.

cy. and enjoyment of the same . . . ." The courts have garnished this constitutional and statutory authority with supplementary principles. Those here helpful are: (I) A real property tax may be levied upon land owned by a public body not used for a public purpose but leased to a private individual for a commercial purpose, *Pittsburgh School District v. Allegheny County*, 347 Pa. 80, 31 A. 2d 725 (1943) ;[2] *Pittsburgh v. Allegheny County*, 351 Pa. 345, 41 A. 2d 639 (1945) ;[3] (II) public property used for a public purpose is entitled to be exempted although persons using the facility are required to pay reasonable charges for refreshment or special entertainment, and this is so whether the public body furnishes those benefits directly or through licensees, *New Castle v. Lawrence County*, 353 Pa. 175, 44 A. 2d 589 (1945) ;[4] (III) indeed, the fact that properties of a public body are leased to private parties deriving profit therefrom instead of being operated by the body will not defeat the exemption if the properties are being used for the specifically authorized public purpose for which they were acquired, *Pittsburgh Public Parking Authority v. Board of Property Assessment*, 377 Pa. 274, 105 A. 2d 165 (1954) ;[5] (IV) it is the use

---

[2] The school district leased plots of land owned by it for a substantial rental to a private individual for a public parking lot.

[3] The city leased to private persons property acquired at tax sale.

[4] The city owned and maintained public parks, one used as a golf-course, the other an amusement park. Charges were made for use of the facilities. The Supreme Court noted that the City "has control over the portions of the park in which . . . licensees or lessees operate."

[5] A parking authority leased its facility to private persons for public parking. The Supreme Court noted: "The operation of the garages by the lessee is to be subject to the rules and regulations from time to time adopted by the Authority. The Authority fixed the initial rates to be charged for the facilities and agrees that it will consult with the lessee if from time to time it should desire to make any changes therein."

of the property and not the use of the proceeds from the property that determines whether tax exemption may constitutionally be granted, *West View Borough Municipal Authority Appeal,* 381 Pa. 416, 113 A. 2d 307 (1955) ;[6] *Freeport School District v. Armstrong County,* 162 Pa. Superior Ct. 237, 57 A. 2d 692 (1948) ;[7] (V) that property used commercially serves the convenience of public users will not justify an exemption nor will the fact that the use is not indispensable or essential thereto defeat exemption; the test is whether the property's use is reasonably necessary for the efficient operation of the facility, *Moon Township Appeal,* 387 Pa. 144, 127 A. 2d 694 (1956) ; (VI) it is a judicial question for the ultimate determination of the courts as to whether the use is public and hence entitled to exemption, *Dornan v. Philadelphia Housing Authority,* 331 Pa. 209, 200 A. 834 (1938) ; *McSorley v. Fitzgerald,* 359 Pa. 264, 59 A. 2d 142 (1948).

Three cases have dealt specifically with the exemption of properties of a municipal airport. *Moon Township Appeal, supra,* upheld a lower court decision that certain shops, bars, stores, offices and a hotel at the Pittsburgh airport were not reasonably necessary to the operation of that public airport and hence not public uses entitled to exemption. In *Moon Township Appeal,* 425 Pa. 578, 229 A. 2d 890 (1967), our Supreme Court affirmed the same lower court's holding that the hotel and a restaurant, newsstand and a portion of a drug store were reasonably necessary to the efficient operation of this great airport. The court said however concerning the hotel:

"In short, it provides a much needed, if not an absolutely required, service.

---

[6] Those portions of a building of a municipal water authority rented to commercial tenants were held taxable.

[7] School district-owned residence leased to an employee held not entitled to exemption.

"Moreover, while it is operated by a concessionaire, under the agreement the airport authorities control the prices charged; the hours of operation and the conduct and service of the employed personnel towards the traveling public. The concession contract is also subject to any conditions included in any agreements entered into by the Airport authorities under the Federal Airport Act." 425 Pa. at 583, 229 A. 2d at 892.

The third case involving property located on a municipally owned airport is *H. K. Porter Company Appeal*, 421 Pa. 438, 219 A. 2d 653 (1966). There our Supreme Court declared taxable, hangars erected and used by the appellant, a business corporation, on land owned by and leased from the municipality, on the ground that the facilities were not reasonably necessary for the efficient operation of the airport as a public instrumentality. Mr. Justice COHEN, for the court, wrote: "Appellant would have us hold that because by its operations at the airport it relieves the airline companies serving the general public of the burden of transporting appellant's employees to their various destinations, its facilities thereupon constitute a public use of the leased premises sufficient to qualify it for an exemption. Appellant's argument is untenable. If appellant were to maintain two hangar buildings at a privately owned airport for the same purposes as the hangars in question, it would accomplish a similar purpose; yet there could be no doubt that it would not be entitled to an exemption. We will not permit appellant to enjoy that status through the guise of maintaining a public service." 421 Pa. at 442, 443, 219 A. 2d at 655.

There remains the application of these principles and examples to the facts of this case. The lessee of the two hangars at the Reading Municipal Airport is Reading Aviation Service, a business corporation and

the fixed base operator at this airport. It sells, repairs, inspects, overhauls and refurbishes aircraft, aircraft engines and components, sells aviation fuels and oil and operates a local commuter service to other cities. For the privilege of carrying on its several activities and using five other hangars at the airport, Reading Aviation Service pays the Reading Municipal Airport Authority a fixed fee, the amount of which is not disclosed on the record.

One scheduled airline operates out of Reading and this produces from 10 to 15 per centum of what the witnesses described as either "our activity" or "our operation." The balance of the activity or operation at the airport is what is sometimes referred to as general aviation, which is the use of the facilities for landing and taking off, fueling, maintenance and hangarage of aircraft owned or operated by members of the public, individual and corporate.

The appellant contends that these T-hangars are at least reasonably necessary to the operation of its airport, because, if they were not provided, the owners of the 16 aircraft there housed might move from the airport, thus reducing the volume of business enjoyed by the fixed base operator and hence its ability to meet the Authority's charge for its use of the airport, and, as its brief states, "seriously [impairing the Authority's] ability to obtain state and federal funds for continuing its ongoing program of maintenance[8] and capital improvements." On the same reasoning, of course, every activity of financial benefit to the public body would be exempted—the lands leased by the school district and city in *Pittsburgh School District v. Allegheny County, supra,* and *Pittsburgh v. Allegheny County, supra,* the stores and offices held not entitled to ex-

---

[8] To this writer's certain knowledge there are no state or federal funds for maintenance.

emption in the *Moon Township cases, supra,* and the business corporation's hangar in *H. K. Porter Appeal, supra.* As the cases instruct us, the crucial point is not whether the public body is benefited by the use of the property but whether the use is in fact public. This requires an examination of the arrangements made between the Authority and Reading Aviation Service.

As earlier noted, the Authority borrowed from a bank to acquire the hangars. The monthly payment necessary to service the loan is $788.08 over a period of 20 years. This is the exact amount of rent payable by Reading Aviation Service and the precise term of its occupancy. The lease provides that Reading Aviation Service may make any interior alterations, additions or changes "which the lessee may deem necessary or advisable in the reasonable conduct of its business" without obligation to restore the premises to their original condition. Conversely, the lease not only imposes no obligation on Reading Aviation to sublet the T-hangars to users of the Airport, it does not require that the property be used for this purpose. Indeed, the possibility that the premises might be subleased for purposes other than T-hangar use is contemplated, for while the lessee is privileged to rent individual hangars without restriction, it is required to obtain the consent of the lessor for underletting in other circumstances. Further, the Authority reserves no control whatsoever over either the persons who are to be permitted to rent T-hangars or the amount to be charged for this use.[9] A copy of a typical T-hangar lease between Reading Aviation Service and a user was admitted into evidence. It contains the following significant provision: "5. The lessee shall have the right to use the facilities of the

---

[9] Reading Aviation Authority was receiving in excess of $1200 gross monthly rentals at the time of the hearing. Under the lease it was responsible for repairs and insurance.

said airport for the purpose of flying the airplane stored in said hangar, but shall not engage in any commercial flying at said field, nor conduct any business enterprise at said airport."

As previously noted, in those cases where leased premises were held to be nevertheless entitled to exemption, some measure of control was retained by the public body. While the cases do not hold and we are not prepared to state that in no event might there be an exemption in the absence of some controls, that element is significant. Here not only has the Authority relinquished all such control to a private business enterprise, it has conditionally agreed that the property might be used for a purpose other than that which it says justifies the exemption. Moreover, Reading Aviation Service understands the extent of its rights; it has limited the use of the property to persons who will agree not to engage in commercial flying or indeed any business enterprise at the airport. This restriction in limiting competition would appear to be of a distinct advantage to Reading Aviation Service and of disadvantage to the Authority in its quest for increased activity at the airport, here asserted as justification for exemption.

We recognize that T-hangars are an attractive feature of an airport devoted mainly to general aviation. If they are available for use by the general public and if under all the circumstances they are reasonably necessary to the functioning of the airport as a public instrumentality, their exemption is proper. Where, however, as here, buildings arranged for T-hangars are provided to a private business entity with no restriction as to use or charges for use and available for rental by that private business organization to persons of its unfettered choosing, we believe that there is not a public use. Here not only might Reading Aviation

Service give preference to users of its other services, it exacted the condition that users not engage in competing businesses at the airport. Under these arrangements the property primarily serves Reading Aviation Service and not the general public using the airport. It is, therefore, not entitled to the public subsidy of tax exemption.[10]

Affirmed.

___

[10] The lease imposes the burden of such local taxes as may be assessed upon Reading Aviation Service.